George Dierschow, Appellant, v. West Suburban
Dairies, Inc., Appellee.

Gen. No. 8,585.

Opinion
filed August 8, 1934.

LANGILLE & LANGILLE, for appellant.

WALTER E. BOERGER, for appellee.

MR. JUSTICE DOVE delivered the opinion of the court.
This is an appeal from a judgment of the county
court of DuPage county in a suit brought by appellant

to recover wages and attorney's fees. The case originated in the justice court, where judgment was rendered in favor of appellant for $106.24, the full amount of his claim. On appeal to the county court, judgment was rendered in favor of appellant for $78.28, which was the amount appellee admitted to be due appellant as wages and the claim for attorney's fees was denied. The case as tried was consolidated with two other cases involving the same question, brought by Orrin Karp and Frederick Gaede against appellee.

The facts in the case are that appellant, on March 17, 1929, was employed as a milk wagon driver by Marx Brothers, a partnership, engaged in the dairy business under the name of Marx Brothers Dairy. In the summer of 1930, Marx Brothers entered into a written contract hereinafter referred to as a Craft contract with the Milk Wagon Drivers Local Union No. 753. Subsequently and on March 5, 1931, Marx Brothers incorporated their business under the name of West Suburban Dairies, appellee herein, and the corporation succeeded to the business of the partnership, acquired all its assets and assumed all its liabilities. Appellant continued in the employ of the concern after its incorporation and until April 22, 1931.

The pertinent part of the Craft contract entered into between the employer and the union provided that the wage scale of a retail route man, such as appellant, would be $50 per week for a six-day week; that the Craft contract would be in effect until May 1, 1932, and that during the life of the contract the employer agreed that no employee would be asked to make any written or verbal contract, the terms of which would conflict with the provisions of the Craft contract. This contract further provided that should charges of drunkenness, dishonesty, incompetency, smoking or drinking while on duty be preferred against any member of the union, and such charges proven, the union agreed that

such member would be fined or suspended and the employer agreed that if any member should be suspended or expelled from the union for good cause, he, the employer, would discharge such person within 30 days after receiving due notice from the officials of the union. By the contract the union agreed, at all times, as far as in its power, to further the interests of the employer and it was mutually agreed that should any controversy arise, not provided for in the agreement, it should be submitted to a committee of five for arbitration, two to be selected by each party and the fifth by the other four, and it was specifically stated that during such time as the matter was pending, there should be no lockout or strike and the decision of the committee should be final.

On October 1, 1930, when the Craft contract became effective, appellant joined the union, paying $100 initiation fee and $18 quarterly dues every three months thereafter and his weekly wages were increased to $50 in order to comply with the terms of the Craft contract. At that time appellant was receiving less than $50 per week and Marx told appellant the amount his wages would be after the Craft contract was executed and appellant stated he would be willing to accept that amount. From October 1, 1930, until April 8, 1931, there was no discussion as to wages and no change therein or in appellant's working conditions. On April 8, 1931, Marx called the drivers, Gaede, Karp, Voirol and appellant into a room adjoining his office. There is a conflict in the evidence as to what was there said. According to the testimony of Marx, he, Marx, stated to the drivers that appellee was steadily losing money and couldn't continue to pay the wages that were being paid; that while he hated to take the step, it was absolutely necessary and a sliding scale had been worked out which he thought would be fair to all. He then stated that commencing at once the rate of

appellant's wages would be $6 per day for six days or $36 per week. To this appellant said: "You are hitting me pretty hard." Marx then told them to talk it over among themselves and decide what they wished to do. Marx then left the room, returned in about one-half an hour, and according to Marx, Voirol there in the presence of appellant and the other drivers said: "The boys have agreed to go along under the new arrangement for the time being." According to Voirol, Gaede, Karp and appellant, Voirol said to Marx: "Let it ride as it is for the time being," and according to the testimony of several of the witnesses, after appellant had said the reduction was hitting him pretty hard, Marx said: "To take it or leave it." Without objection appellant testified that he did not agree to work under the reduced wage scale of $36 per week, but because he was a member of the union he found out he could not leave the employment of appellee and so continued to work for appellee thereafter and until April 22, 1931, when appellant received a check for wages at the rate of $36 per week. Appellant retained this check and thereafter instituted this suit.

In the lower court it was stipulated by the parties hereto that appellant received his wages in semi-monthly payments and has received all moneys due him to and including April 8, 1931; that the issue now to be tried is whether, when appellant went to work on the morning of April 9, 1931, he was employed under a separate and different contract from that which applied to his employment on the day before and during the period between October 1, 1930, and April 8, 1931; that appellant claims his rate of wage was $50 a week from April 9, 1931, to April 22, 1931, while appellee claims that according to negotiations in April, appellant's wages became $36 per week from April 9, 1931, to April 22, 1931, inclusive; that the simple question presented for decision is whether the contract in force to

and including April 8, 1931, continued in force until April 22, 1931. If the court finds it did and thereby sustains the contention of appellant, the amount due appellant is $106.24. If the court sustains the contention of appellee, the amount due the plaintiff is $78.28. A similar stipulation was made as to Karp and Gaede.

Appellee insisted in the trial court and contends in this court that the Craft contract between it and the Milk Wagon Drivers Local Union No. 753 is not a contract between it and the individual members of the union and that although a party thereto, it had a right to make an independent contract with appellant with reference to the amount of wages appellant was to receive and had a perfect right to disregard the existing agreement which it and appellant's union had previously executed. The county court held that a new contract of employment between appellant and appellee was made on April 8, 1931; that the Craft contract lacked mutuality and appellee was not bound by its provisions and therefore rendered judgment in favor of appellant for the stipulated sum of $78.28.

Appellant does not insist that the Craft contract constituted a contract of employment between him and appellee, inasmuch as it did not obligate appellant or anyone else to work, nor did it obligate appellee to pay appellant or any particular person money. Appellant does contend, however, that the Craft contract obligated appellee, if it employed appellant and he was a member of the union, to abide by the terms and conditions of the employment which were fixed, regulated and determined by the provisions of the Craft contract; that the Craft contract was made by his union for his benefit and he, having accepted the provisions of the contract, may enforce the benefits accruing to him.

In *Gulla v. Barton,* 149 N. Y. S. 952, it appeared that the defendant operated a brewery and entered into an

agreement with Malsters' Union, No. 48, of Syracuse, N. Y., by the terms of which defendant agreed to employ only union men, and in the event extra help was needed, members of the International Union of United Brewery Workmen, of which Malsters' Union was a local subordinate branch, should be employed, at union wages, and all employees were to receive $18 per week. This agreement provided that it was to continue in force one year from October 1, 1912, and was renewed for another year. In the years 1911 and 1912 plaintiff worked for the defendant for 29 weeks and in 1912 and 1913 he worked for the defendant 20 weeks and received therefor $9 per week, the weekly wage agreed upon between him and the defendant, and this suit was instituted to recover $9 more for each week's service, the plaintiff basing his action upon the contract of defendant and the Malsters' Union. In its opinion, the court said: "The defendant's object in making the agreement with the union was to prevent strikes and to secure the use of the union label. The union furnished labels, and the defendant used them, and did business all the time referred to as a union brewery. The union was formed for the benefit and protection of its members, and especially for the purpose of securing to them a reduction in the hours of toil and an increase in wages. The union is based upon the idea that the individual workmen cannot fully protect themselves against their employers, but that by united action they can be better protected in the respects mentioned. It is supported by dues and fees paid by its members, which dues the member pays for the benefit which he expects to realize from the organized action of himself and his coworkers. The agreement referred to was a valid contract, which may be enforced in any proper manner. The renewal of the agreement indicates that it was beneficial to the defendant's firm. The union entered into the contract for the benefit of the plaintiff and the

other employees in the defendant's brewery, and for the benefit of all union workmen. It is urged, however, that the plaintiff cannot maintain an action upon the agreement, and that he has waived the benefits of it by contracting for himself. Apparently he did not know of the agreement between the defendant and the union until May, 1913, when a dispute arose between the plaintiff, the defendant, and the other employees. An officer of the union was called to the brewery, and then showed plaintiff the agreement, and insisted that hereafter union wages must be paid according to the agreement, and for the remainder of the season such wages were paid; the plaintiff stating to the defendant at the time that he would look for his back pay through law. The evidence does not show any act of the plaintiff, made with knowledge of the facts, which would waive the benefit of the contract with the union in his behalf. We have, therefore, a situation where the plaintiff received from week to week the wages contemplated by the contract of employment between him and the defendant, and his union unbeknown to him had made a contract for his benefit, based upon a separate consideration passing from the union, that he as a member thereof should receive a greater compensation. In payment for the labels and the use of the union name in marketing the brewery product, the defendant had agreed to pay a stated union wage to the plaintiff and to the other men working with him as members of the union. The union label had force and value, and the union had strength by reason of the moneys which it received as fees and dues from the plaintiff and other members. The plaintiff is therefore connected with the consideration and was a party intended to be benefited by the agreement. *Smith v. City of New York,* 203 N. Y. 106, 96 N. E. 409. It was a contract made by his representative for his benefit, and its validity is not affected by the independent agreement, express or

implied, between him and defendant. The contracts are concurrent and neither one destroys the other. The nonsuit was therefore improper. Upon the evidence as it stood, the plaintiff was entitled to receive $18 per week for the time served. Having received only $9 per week for the time mentioned, he may recover the difference."

In *Jacobs v. Cohen,* 183 N. Y. 207, 76 N. E. 5, 2 L. R. A. (N. S.) 292, it was held that a contract made by an employer and a labor union by the provisions of which the employer agreed to retain in his employ only members of a labor union who were in good standing was valid and enforceable.

The Appellate Court of the State of Ohio, in *H. Blum & Co. v. Landau,* 23 Ohio App. 426, in discussing a somewhat similar contract, said: "That such a contract as the one at bar is enforceable there can be no question. It clearly appears that the contract between the Garment Manufacturers' Association and the International Ladies' Garment Workers' Union was a contract made for the benefit of third parties, and that one of its considerations was lodged in the purpose and intent to prevent strikes and lockouts deleterious to the contracting parties. It may be said that the plaintiff below, Rose Landau, was not a party to the agreement and therefore that she could not claim under this principle. While formerly it was necessary to have the person for whose benefit the contract was made a party thereto, yet the great weight of later decisions is to the effect that where the name of the third party does not appear to the contract, if the terms are made for the benefit of such person, the provisions of the contract are enforceable, if they are otherwise meritorious, in a legal sense."

Appellee insisted in the trial court and that court found that a new contract of employment was made by appellee with appellant on April 8, 1931. It is true

that on that day appellee told appellant that his wages, commencing at once, were reduced from $50 to $36 per week and that he could either take it or leave it, and it is also true that appellant continued in the employ of appellee thereafter. The provisions of the Craft contract which appellee had executed provided: "It is further agreed by the employer (appellee) that no employee (appellant) will be asked to make any written or verbal contract which may conflict with this agreement." To hold that appellee can now set up a new contract of employment with appellant made on April 8th is to hold that appellee may, at will, breach its own deliberate agreement which it had bound itself to observe and take advantage of its own wrong. The provisions of the Craft contract also bound appellee, in the event of a controversy over wages, to submit such controversy to arbitration and during the period of arbitration there would be no lockout or strike. The evidence further discloses that the by-laws of the union of which appellant was a member provided that: "Any member found working below the scale of wages which is in the agreement entered into between the Union and the proprietors and owners, will, upon careful investigation, be fined or suspended." These by-laws also provide certain sick benefits for its members, payable only while the members are in good standing, and certain death benefits, payable only in the event the member was in good standing at the time of his death. If appellant therefore had not continued to work for appellee, the relation of employer and employee would have terminated and the matter of arbitration come to an end, and he would have been violating the by-laws of his union. If he had voluntarily accepted a reduction in wages, he would also have violated the by-laws of his union, subjecting him to a fine, suspension and loss of valuable rights belonging to him as a member in good standing. The weight of the evidence in this

record inclines us to the opinion that the minds of appellant and appellee did not meet on the 8th of April so that appellee can now be heard to say that a new agreement was made whereby appellant consented to accept a new and lower wage scale than the one under which he had theretofore been working.

In support of its contention that a new contract of employment was made by it with appellant on April 8th, appellee relies upon the case of *Langmade v. Olean Brewing Co.*, 137 N. Y. App. Div. 355, in which it was held that the employee could not recover on the Craft contract because he had made an independent contract with his employer in disregard of the provisions of the Craft contract. The facts in that case distinguish it from the facts in this case. As said above, we hold that it is not shown by the evidence in this record that a new, independent contract was made on April 8, 1931.

Appellee also cites the case of *W. S. Snow Iron Works v. Chadwick*, 227 Mass. 382. This was a suit by an employer to recover from a labor union on account of the refusal of certain of its members to go to work, and it was held that officers of a labor union cannot contract for the members of the union unless they have been expressly or impliedly authorized to do so by the members. In that case it appeared that the members of the labor union never went to work under the terms of the Craft contract, so as to them it was not a completed contract of employment. This case is to be distinguished from the other Massachusetts cases which hold that a Craft contract was binding on the employee who worked under it as a member of the union which executed it. In *Whiting Milk Cos. v. Grondin*, 282 Mass. 41, 184 N. E. 379, the court enforced a provision in the Craft contract against both the labor union and the employee, which provided that a discharged employee should not interfere with the employer's business for 90 days after his discharge.

It is interesting to compare the text of paragraph F, entitled "Contracts for Members," appearing in 24 Cyc. 824, with the corresponding section in 63 C. J. 671 under the same heading. The article in Cyc. is as follows: "A labor union ordinarily has no authority to make a contract with employers of its members in respect to the performance of work and the payment for it. In order to bind the individual members they must expressly assent to the terms of the contract. Such assent will not be implied from the fact that they have knowledge at the time of the contract. It cannot maintain an action to enforce a contract made by it on behalf of its members. Nor is it liable to suit on such a contract, which is enforceable only against the individual members who are guilty of a breach of it. An individual member of a labor union, not being bound by the terms of the contract made between the union and its employers as to the time of payment of his wages, has a right to sue therefor on the completion of his work, in the absence of any express contract with him." The corresponding paragraph in 63 C. J. 671 is as follows: "Workers may act in concert through their union in the sale of their labor on stipulated terms, so that a union may enter into a contract with an employer for the benefit of its members. Accordingly, the union may enter into a contract with an employer prohibiting him from employing other than union labor, or using materials made up by nonunion labor, and for a breach of such contract the union may recover damages. They may voluntarily enter into an agreement giving the union the right to call a strike in order to prevent the employer from doing work for another against whom a strike is pending, or from giving work to such an employer. The union has a right to contract for the securing of certain classes of work to its members, and such contract is not in contravention of public policy. A contract between a union

and an employer binding the latter to the employment of union labor only at specified rates of wages is valid, and imposes the reciprocal obligation on the union and its members to work in accordance therewith. A contract made by a union and an employer for the benefit of employees is valid and may be enforced by an employee, even though not mentioned by name in such contract. Notwithstanding the foregoing, a trade union being the agent of a member only for the limited purpose of securing for him and all other members fair and just wages and good working conditions, it ordinarily has no authority to make a contract with employers of its members in respect of the performance of work and the payment therefor. In order to bind or confer rights upon the individual members they must expressly assent to the terms of the contract, as by entering into a contract of employment with reference to the union's contract as a usage. Such assent will not be implied from the mere fact of membership, nor from the fact that the members have knowledge at the time of the contract. In the absence of such ratification or assent, a member cannot, as an individual, recover for a breach of any such contract. A voluntary agreement between a union and an employer pursuant to which the employer obtained workmen's compensation insurance for the benefit of its members on the understanding that they were not required to accept it, but that, if they did, it was to be a bar to any other recovery, is not binding on an employee member accepting payments made by the insurance company, where it does not appear that such employee knew of such agreement or accepted such payments with knowledge thereof. In the absence of anything indicating assent by particular employees, a provision in an agreement between the union and the employer, regulating the terms of employment, that the contract is to remain in effect for a designated period, does not operate to fix the term of employment of employees

of such employer. Hence, an individual member of a labor union, not being bound by the terms of the contract made between the union and its employers as to the time of payment of his wages, has a right to sue therefor on the completion of his work, in the absence of any express contract with him.''

In support of the statement in the text that a contract made by a union and an employer for the benefit of the employees of the employer is valid and may be enforced by an employee although not mentioned by name in such contract, the cases of *H. Blum & Co. v. Landau, supra; Piercy v. Louisville & N. R. Co.,* 198 Ky. 477, 248 S. W. 1042, 33 A. L. R. 322; *Yazoo & M. V. R. Co. v. Sideboard,* 161 Miss. 4, 133 So. 669; *Gulla v. Barton, supra; Gross Mountain Coal Co. v. Ault,* 157 Tenn. 461, 9 S. W. (2d) 692, are cited. In *Yazoo & M. V. R. Co. v. Sideboard, supra,* the following language is used in the opinion: ''Although only a few years ago the courts were holding that an individual member of a labor union could not maintain an action for the breach of an agreement between an employer and the union of which the plaintiff was a member in respect to wages and other rights fixed in the contract, *Hudson v. Cincinnati, etc., R. Co.,* 152 Ky. 711, 154 S. W. 47, 45 L. R. A. (N. S.) 184, Ann. Cas. 1915B 98; *West v. Baltimore & O. R. Co.,* 103 W. Va. 417, 137 S. E. 654; *Burnetta v. Marceline Coal Co.,* 180 Mo. 241, 79 S. W. 136, these rulings have been left in the rear in the advancement of the law on this general subject, and the holdings now are that these agreements are primarily for the individual benefit of the members of the organization, and that the rights secured by these contracts are the individual rights of the individual members of the union, and may be enforced directly by the individual. *Piercy v. Louisville & N. Ry. Co.,* 198 Ky. 477, 248 S. W. 1042, 33 A. L. R. 222; *Gulla v. Barton,* 164 App. Div. 293, 149 N. Y. S. 952; *H. Blum & Co. v. Landau,* 23 Ohio App. 426, 155 N. E. 154; *Cross*

*Mountain Coal Co. v. Ault,* 157 Tenn. 461, 9 S. W. (2d) 692.''

The case of *Hudson v. Cincinnati, N. O. & T. P. Ry. Co., supra,* referred to in the above excerpt from the opinion in *Yazoo & M. V. R. Co. v. Sideboard, supra,* is cited by appellee and the case most strongly relied upon by it to sustain the judgment of the trial court. Hudson, an engineman, instituted suit to recover from his former employer $2,000, the alleged value of time lost by him from June 28, 1907, to December 1, 1908. The amended petition alleged that petitioner was discharged on June 28, 1907, for an infraction of the rules of the defendant company in violation of a contract between defendant and the order of Brotherhood of Locomotive Engineers of which plaintiff was a member in good standing. The amended petition set forth this contract in full. It contained a list of stations, rates of pay, hours of service, order of seniority, together with numerous other matters, provided that the rules and regulations therein contained would be in effect two years from December 1, 1906, and concluded: ''In case an engineman believes his suspension or discharge unjust, he shall within ten days appeal to the superintendent by letter; and if found to have been unjustly suspended or dismissed, he shall be reinstated and paid for all time lost. The proper officers of the company will at all times listen to any complaint that enginemen as a body or individuals may wish to present, and under ordinary circumstances make prompt decision in regard thereto.'' The petitioner charged that his discharge was unjust; that he, within 10 days thereafter, by letter, appealed to the superintendent of the defendant for an investigation of the charges against him, offering to submit proof of his innocence and asked for a reinstatement, but the officer refused to make known the results of his investigations or to reinstate the plaintiff. A demurrer to the amended

petition was sustained and in affirming the ruling of the trial court the Supreme Court of Kentucky held that the agents of the union in the execution of the agreement with the defendant in no way bound the individual member thereof and was not the agent of the plaintiff; that the period of service of plaintiff's contract of employment with the defendant was indefinite and either party had a right to terminate it any time for or without cause; that defendant did terminate the contract by discharging the plaintiff and his claim, being for time lost after the determination of the contract between him and the defendant, the petition stated no cause of action. It will be observed that what the court held in this case was that the contract of employment between Hudson and his employer was indefinite as to time, and by discharging him, as it had a right to do, no provisions of the Craft contract, so far as the petition disclosed, were violated. It does not hold that a Craft contract is not enforceable when once it is shown that the member of the labor union went to work for the employer under its provisions. In the instant case the provisions of the Craft contract were violated by appellee when it sought, on April 8th, to either discharge appellant or compel him to accept a cut in his wages to $36 per week.

In *Burnetta v. Marceline Coal Co., supra,* also cited and relied upon by appellee, it appeared that Burnetta was a union coal miner and he brought suit against his employer for his wages. He voluntarily left the employment of the company and the company admitted it was indebted to him for the amount sued for, but contended it was not due at the time suit was instituted. The court in disposing of the question as to whether a contract made by a union and an employer in respect to rates and regulations inured to the benefit of its members said: ''The Miners' Union is not an organization for the purpose of conducting any business

enterprise, but is purely one for the protection of labor against the unjust exactions of capital. The members of the union do not labor in coal mines for the organization, but each member works for himself, and whatever compensation he receives is for the benefit of himself and his family. That the Miners' Union, as an organization, cannot make a contract for its individual members in respect to the performance of work and the payment for it, in our opinion, is too clear for discussion . . . . While it may be true that a labor organization may have rules requiring the employer to designate certain pay days, and if you employ a member of the organization, or even one who is not a member, and by agreement his services are to be paid on the designated pay days, as established by the rules, it could well be insisted that the contract fixes the time of payment, that is upon the theory that the individual so contracts, and by no means upon account of his being a member of the organization which has undertaken to contract for him. A contract on the part of an individual that he will perform certain work under the rules of an organization is not to be inferred from the simple fact that he is a member of the organization. Persons work for themselves, and are free and independent. Agreements imposing conditions can only be enforced when the entire proposition has been stated and by them freely accepted.'' The court then cites the paragraph from 24 Cyc. 824, *supra*. What the *Burnetta* case held was that a contract is not to be inferred on the part of an employee that he will perform certain work under the rules of his labor union from the simple fact that he is a member of the labor organization.

In 13 C. J. 705, the author of the article on contracts says with reference to a promise made for the benefit of a third person that in most of the States the English doctrine that where a person makes a promise to

another for the benefit of a third person the latter cannot maintain an action on it is not recognized, but it is held in most of the States of the United States that the action may lie. Many Illinois cases are cited in note 4, as sustaining this proposition. In the same volume at page 709, section 817, it is stated: "In many of the cases the doctrine is stated broadly that a person may maintain an action on a promise made for his benefit, although not a party to the contract; but this statement of the doctrine is too broad. By the weight of authority the action cannot be maintained merely because the third person will be incidentally benefited by performance of the contract; he must be a party to the consideration, or the contract must have been entered into for his benefit, and he must have some legal or equitable interest in its performance." As supporting the text, numerous Illinois cases are cited on page 710.

In 6 R. C. L. 884, sec. 271, the author says: "Stated in general terms and leaving out of view the limitations recognized in various jurisdictions, the rule is that a third person may enforce a promise made for his benefit even though he is a stranger both to the contract and to the consideration. In other words, it is not necessary that any consideration move from the third party; it is enough if there is a sufficient consideration between the parties who make the agreement for the benefit of the third party. This doctrine, originally an exception to the rule that no claim can be sued upon contractually unless it is a contract between the parties to the suit, has become so general and far reaching in its consequences as to have ceased to be simply an exception, but is recognized, within certain limitations, as an affirmative rule." The same authority at page 886, section 274, says: "Under the rule that a beneficiary may enforce a contract, the contract must have been intended for the benefit of a

third person. It is not sufficient that the performance of the covenant may benefit a third person. It must have been entered into for his benefit, or at least such benefit must be the direct result of performance and so within the contemplation of the parties. The fact that one not a party or privy to a contract is incidentally benefited under it is no reason for declaring that the contract was made and intended for his benefit. A contract between two persons cannot be held to be for the benefit of a third from the mere fact that its breach, or negligence in discharging the duties undertaken by it, has resulted in injury to such third person. . . . Of course, the name of the person to be benefited by the contract need not be given if he is otherwise sufficiently described or designated. Indeed he may be one of a class of persons, if the class is sufficiently described or designated. In any case where the person to be benefited is in any manner sufficiently described or designated, he may sue upon the contract.''

In the instant case appellee made a valid, written contract with the Milk Wagon Drivers' Local Union No. 753. Appellant expressly assented to its terms, entered into a contract of employment with appellee with reference to its provisions and was one of the parties intended to be benefited thereby. We believe, under the foregoing authorities, that appellant has a remedy under the provisions of that contract and that justice and fair dealing entitles appellant to recover from appellee in this proceeding the amount appellee by its agreement promised to pay him.

The judgment of the county court of DuPage county is therefore reversed and this cause is remanded with directions to that court to hear evidence as to attorney's fees as provided in the stipulation of the parties, and to then render judgment in favor of appellant in accordance with the views herein expressed.

*Reversed and remanded with directions.*